**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:19-CR-0073 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EMMANUEL GERMAN-ALMANZAR | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion to dismiss the indictment based on a violation of
the Sixth Amendment right to a speedy trial filed by Defendant Emmanuel
German-Almanzar ("German-Almanzar").  (Doc. 38.)  Although the court finds
that three of the *Barker* factors weigh in favor of German-Almanzar, he has not
established general or specific prejudice.  Thus, for the reasons that follow, the
court will deny the motion to dismiss the indictment.

### BACKGROUND

On February 27, 2019, the United States (or "the Government") filed a nine-
count indictment against German-Almanzar for drug and firearm offenses that are
alleged to have occurred between June 12, 2014, and August 7, 2014.  Specifically,
the indictment charges as follows: distribution of heroin and cocaine hydrochloride
in violation of 21 U.S.C. § 841(a)(1) (Count 1); distribution of heroin in violation
of 21 U.S.C. § 841(a)(1) (Counts 2 and 5); distribution of cocaine hydrochloride in
violation of 21 U.S.C. § 841(a)(1) (Counts 3, 4, 6, and 7); possession with intent to

distribute heroin and cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 8); and

possession of a firearm in furtherance of a drug trafficking crime in violation of 18

U.S.C. §924(c) (Count 9).  (Doc. 1.)  An arrest warrant was also issued on

February 27, 2019.  (Doc. 5.)  On November 17, 2022, German-Almanzar

appeared for his arraignment and pleaded not guilty.  (*See* Doc. 13.)  German-

Almanzar was released on conditions the same day.  (Doc. 17.)

   Following irreconcilable differences between German-Almanzar and

counsel related to whether it was appropriate to file the motion before the court, the

court appointed new counsel for German-Almanzar on March 3, 2023.  (Doc. 31.)

On July 27, 2023, German-Almanzar filed the present motion to dismiss for pre-

arrest delay as well as a brief in support.  (Docs. 38, 39.)  The Government filed a

brief in opposition on August 10, 2023.  (Doc. 42.)  No reply brief was filed.  On

October 26, 2023, the court held an evidentiary hearing on the motion.

   During the hearing, evidence was presented regarding the measures taken by

the Government to locate German-Almanzar and German-Almanzar's lack of

knowledge of the indictment.  FBI Special Agent Christopher Nawrocki and York

County Detective Chris Keppel testified for the Government providing a timeline

of the activity that occurred.  German-Almanzar testified on his own behalf.  The following facts are drawn directly from the hearing testimony.[1]

In the summer of 2014, Detective Keppel, then a trooper with the Pennsylvania State Police, was investigating a large-scale drug and firearm trafficking organization that involved the Dominican Republic, York County, Adams County, and California.  German-Almanzar became a target of this investigation along with fifteen or more other individuals.  Detective Keppel personally observed controlled purchases of narcotics with German-Almanzar.  On August 7, 2014, following a surveilled drug transaction, German-Almanzar was arrested, but not charged.  After a meeting with law enforcement and his attorney, Rick Robinson, German-Almanzar agreed to cooperate, which he did until sometime in 2015.  During that time, Detective Keppel had an active phone number for German-Almanzar and would communicate with him via text and phone calls.  Detective Keppel also knew German-Almanzar's home address and observed him at that location.

At some point in 2015, Detective Keppel was no longer able to reach German-Almanzar.  In 2016, Detective Keppel contacted Attorney Robinson to see if he had contact with German-Almanzar as he wanted German-Almanzar to testify

---

[1] A transcript of the suppression hearing was not ordered.  Accordingly, the court has relied on detailed notes in setting forth the material facts.

in certain cases.  Attorney Robinson reported that he had not been in contact with German-Almanzar and did not have current contact information for him. Eventually, York County filed related charges against German-Almanzar and the indictment in this case was filed on February 27, 2019.  On March 5, 2019, law enforcement entered the indictment and corresponding arrest warrant into the NCIC database.

After the indictment was filed, law enforcement followed several leads to try to locate German-Almanzar.  Detective Keppel testified that he shared German-Almanzar's photo with confidential informants in an effort to locate him.  In 2019 and 2020, confidential informants provided information that German-Almanzar was seen in a club in Baltimore and was at Penn Park in York, Pennsylvania. Detective Keppel immediately followed up on these leads to no avail.  In 2020, law enforcement received information that German-Almanzar was in Yonkers, New York.  The United States Marshals Service made contact with individuals at two addresses in Yonkers, but did not locate German-Almanzar there either.  Detective Keppel testified that he periodically drove by the York addresses and reached out to Attorney Robinson during this time as well.  However, Detective Keppel never made contact with any individuals at any of the potential addresses he had in York.

Special Agent Nawrocki testified that all warrants are recertified yearly to verify that a person is still wanted on an active warrant.  Before recertifying a

warrant, the FBI would have checked with the United States Attorney's Office to verify that the case was still active and would have asked agents involved in the case whether they had any additional information. FBI analysts typically perform a search of Lexis and Accurint to find information regarding employment and other government records. While Special Agent Nawrocki could not confirm that was done for German-Almanzar, he believes these steps were completed as it is done as a matter of course leading up to the recertification of any warrant. German-Almanzar's information was recertified in August 2020 and August 2021.

The Government presented a single law enforcement report regarding the Government's effort to locate German-Almanzar. According to Detective Keppel, he was constantly looking for German-Almanzar, but only documented it when there was a possible lead. A supplemental investigative report dated May 27, 2020, confirms that Detective Keppel checked the York City area and reached out to confidential informants for any information on German-Almanzar's location. (Gov. Ex. 1.)[2] Additionally, the report indicates that the United States Marshals attempted to locate German-Almanzar in Yonkers without success. (*Id.*)

German-Almanzar testified that he lived with his father on Kings Mill Road in York County in 2014. In November or December 2014, German-Almanzar

---

[2] All exhibits referenced herein were admitted into evidence during the October 26, 2023 hearing.

changed his telephone number.  He then moved to Yonkers, New York with his mother and sister and lived at two addresses over several years.  He was employed as a school bus driver in Yonkers from June 24, 2016, through November 6, 2020.  (Def. Ex. 106.)  In 2020 or 2021, German-Almanzar moved to Bridgeport, Connecticut and was a school bus driver in Connecticut from January 5, 2021, through April 29, 2022.  German-Almanzar testified that had an annual background check performed as part of his employment as a school bus driver, which included fingerprinting and an iris scan.  German-Almanzar recalls an officer in a government building performing these background checks.

On October 23, 2021, German-Almanzar began training to obtain a CDL A, which he completed on March 22, 2022.  (Def. Ex. 107.)  Once getting his CDL A, German-Almanzar registered his truck and started a trucking business in Connecticut as a limited liability company.  Through this process he had to go through the "FMCSA" testing, which he described as a government security test for truck drivers through the National Transportation Safety Board.

Detective Keppel testified that a record check for a commercial driver's license ("CDL") and a background check should trigger the NCIC warrant if those checks were done properly.

German-Almanzar further reported that he took out a loan in 2021 and purchased a house in Bridgeport, Connecticut.  In 2022, German-Almanzar sold

his Bridgeport home and moved to Waterbury, Connecticut.  Recently, he moved

homes in Waterbury and has been driving trucks up and down the east coast.

Since 2008, German-Almanzar has been in contact with the York County

Domestic Relations Office regarding child support and custody.  In 2020, he

appeared in person for a court proceeding in the York County courthouse.

Regarding travel, German-Almanzar provided a copy of his passport

showing that he traveled to the Dominican Republic from April 15, 2019, through

April 18, 2019, which is after the warrant was entered into NCIC.

Detective Keppel advised that throughout the investigation, he never had any

information that German-Almanzar planned to travel to the Dominican Republic

even though other targets traveled internationally.  Therefore, he never checked

with U.S. Immigration and Customs Enforcement although he agreed that he could

have done so.  Detective Keppel was also unaware that German-Almanzar had

children and had court appearances in York County related to those children.

German-Almanzar learned of the related York County charges after

attempting to renew his passport, which expired on May 2, 2021.  He testified that

the United States notified him that he could not renew his passport because of the

York County arrest warrant.  Once he learned about this warrant, he contacted

Attorney Robinson, who filed a motion to dismiss in 2021.  After approximately a

year of attempting to have his case dismissed, German-Almanzar appeared

remotely before a magisterial district justice in April 2022.  Because he appeared remotely, he was not fingerprinted at the time of his arraignment.  Thereafter, on September 23, 2022, the Court of Common Pleas of York County dismissed the charges against German-Almanzar.  (Def. Ex. 102.)

In September 2022, German-Almanzar first learned of the federal indictment and arrest warrant.  He then coordinated with Attorney Robinson to surrender on the federal arrest warrant and did so as scheduled on November 17, 2022.

## DISCUSSION

The Sixth Amendment states, in pertinent part, that "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial[.]"  U.S. CONST. AMEND. VI.  "The United States Supreme Court has adopted a flexible balancing test to adjudicate alleged violations of the Sixth Amendment Speedy Trial Clause."  *Hakeem v. Beyer*, 990 F.2d 750, 759 (3d Cir. 1993) (citing *Barker v. Wingo*, 407 U.S. 514, 533 (1972)).  The factors for the court to consider are: "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Barker*, 407 U.S. at 530.  All factors must be considered and weighed as no one factor is dispositive or "talismanic."  *Id.* at 533.

### A. Length of Delay

The Supreme Court has explained that the first factor, the length of delay, actually involves two inquiries:

> Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay, since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time.

*Doggett v. United States*, 505 U.S. 647, 651 (1992) (internal citations omitted).

"Presumptive prejudice," as defined by the Supreme Court in this threshold context, simply "marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Id.* at 652 n.1. The Supreme Court found that a delay of 8.5 years is sufficient to trigger this review. *Id.* at 652. Indeed, the Third Circuit has held that a delays of as little as "fourteen months is sufficient to trigger review of the remaining *Barker* factors." *United States v. Claxton*, 766 F.3d 280, 294 (3d Cir. 2014) (quoting *United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009)).

Here, the delay between the indictment and German-Almanzar's arraignment is 3 years, 8 months, and 21 days (or approximately 45 months). German-Almanzar submits that this length of delay shifts the burden to the Government to justify and should weigh heavily against the Government. (Doc.

39, p. 4–5.)[3]  The Government acknowledges that a delay of over three years likely warrants a review of the remaining *Barker* factors.  (Doc. 7, pp. 5–7.)  However, the Government does not concede that the length of delay in this case should weigh against it.

The court finds that the delay of nearly 45 months meets the threshold to trigger an inquiry into the remaining *Barker* factors.  As to whom to assign this weight, the court holds that this delay weighs heavily against the Government and in German-Almanzar's favor.  *See Battis*, 589 F.3d 678–79 (holding that a delay of forty-five months between indictment and trial, especially given "the relatively straightforward nature of the charges," intensified "any prejudice" caused by the delay and weighed heavily against the Government).

**B. Reason for Delay**

Next, the court will consider the second *Barker* factor: the reason for the delay.  German-Almanzar argues that the Government failed to exercise due diligence to locate him when he was living openly in the United States under his own name.  (Doc. 39, pp. 5–6.)  Instead, the Government did the bare minimum to try to locate German-Almanzar, thus, making the Government negligent in its pursuit of him and the cause of the delay.  (*Id.*)

---

[3] For ease of reference, the court uses the page numbers from the CM/ECF header.

The Government opposes this view of its efforts to locate German-Almanzar.  (Doc. 42, pp. 9–12.)  Before being federally indicted, German-Almanzar knew he was the subject of a drug investigation, was arrested following a hand-to-hand transaction, and met with his attorney and agents as part of that drug investigation.  (*Id.* at 9.)  The Government submits that even if German-Almanzar was unaware of the indictment, it does not discredit the Government's efforts to locate him.  (*Id.* at 10–12.)  Comparing this case to *United States v. Velazquez*, the Government asserts that law enforcement was reasonably diligent in the necessary ways described by the *Velazquez* court.  (*Id.* at 11–12.)

The reason for the delay is "[t]he flag all litigants seek to capture . . . ." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).  As the Court of Appeals for the Third Circuit has explained:

> The government bears the burden of justifying the delay in bringing a defendant to trial.  *Battis*, 589 F.3d at 680 (citing *Hakeem*, 990 F.2d at 770).  "In evaluating this factor, we subtract the amount of delay caused by the defendant from the delay caused by the Government." *Id.* (citing *United States v. Dent*, 149 F.3d 180, 184–85 (3d Cir. 1998)).  In *Battis*, we set forth the three categories of delay and the resulting weight each carries against the government: (1) "A deliberate effort by the Government to delay the trial in order to hamper the defense weighs heavily against the government;" (2) "A more neutral reason such as negligence or overcrowded courts also weighs against the Government, though less heavily;" and (3) "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* at 679 (internal quotation marks and citations omitted).  "By contrast, delay caused by the defense weighs against the defendant." *Id.* at 680 (internal quotation marks omitted).

*United States v. Claxton*, 766 F.3d 280, 294–95 (3d Cir. 2014).

In assessing this factor when a defendant cannot be located post-indictment, courts evaluate whether the defendant intentionally evaded prosecution and whether the Government reasonably exercised due diligence to locate the defendant. *United States v. Velazquez*, 749 F.3d 161, 178–81 (3d Cir. 2014); *see also United States v. Davenport*, --- F. Supp. 3d ----, No. 21-480, 2024 WL 1442299, at *7 (W.D. Pa. Apr. 3, 2024); *United States v. Molina-Garcia*, No. 20-288, 2022 WL 2116828, at *6 (E.D. Pa. June 13, 2022). "If 'the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit." *United States v. Velazquez*, 749 F.3d 161, 175 (3d Cir. 2014) (quoting *United States v. Mendoza*, 530 F.3d 758, 763 (9th Cir. 2008)). Additionally, a defendant has no "responsibility to contact the government during [an] investigation," nor is it a defendant's "duty to bring himself to trial." *Mendoza*, 530 F.3d at 763; *Barker*, 407 U.S. at 527. A court may consider whether a defendant changed his behavior post-indictment, which "could be attributed to a deliberate effort . . . to evade detection." *Velazquez*, 749 F.3d at 179.

Here, the is no evidence that German-Almanzar tried to avoid detection. After his arrest and initial cooperation with law enforcement, German-Almanzar had no responsibility to continue his contact with the Government as he was not

charged at that time.  Instead of avoiding detection, German-Almanzar lived in such a manner that he could have been located.  He worked as a school bus driver, which required a background check, from June 2016 through April 2022.  He traveled to the Dominican Republic approximately two months after the indictment in this case was returned and the arrest warrant was entered into NCIC.  He obtained a CDL A license and, according to his testimony, went through a government security test with the National Transportation Safety Board.  German-Almanzar bought and sold a home, and continued to be in contact with the York County Domestic Relations Office regarding support for his child.  In 2020, he even appeared for an in-person proceeding in the York County courthouse.

German-Almanzar also credibly testified that he was unaware of any criminal charges against him until he tried to renew his passport in 2021.  Only then did the United States notify him that his passport could not be renewed because of the arrest warrant associated with the York County charges.  Shortly thereafter, he contacted Attorney Robinson to attempt to resolve those charges.  Even after learning about the York County charges, German-Almanzar did not learn about this federal indictment until Attorney Robinson advised him of it in September 2022.  He then immediately took steps through his attorney to surrender on the federal arrest warrant and appeared in court, as scheduled, for his arraignment on November 17, 2022.  Thus, given all of this evidence, the court

finds that German-Almanzar did not intentionally evade prosecution through his conduct.

Turning to the Government's duty to exercise due diligence to bring German-Almanzar to trial, the court cannot find that the Government made a "serious effort." *See Velazquez*, 749 F.3d at 180. Law enforcement made some effort to locate German-Almanzar in 2015 and 2016 so that he could potentially testify in certain cases. Between that time and February 27, 2019, the date of the indictment, the Government presented no evidence that it investigated German-Almanzar's whereabouts. Once indicted, law enforcement simply entered the indictment and arrest warrant into NCIC and followed up with confidential informants from time to time. There is only one report from 2020 documenting the three potential leads that were pursued in a period of nearly four years.

Detective Keppel admitted that he could have checked with Immigration and Customs Enforcement but did not do so. He also believed that the CDL record check and background checks should have triggered the NCIC warrant if done properly.[4] Further, law enforcement did not attempt to develop any leads from checking the two addresses in Yonkers, New York, even though German-

---

[4] While there was no evidence presented on this point, the court questions whether the arrest warrant was properly entered into NCIC as the warrant did not come up when German-Almanzar attempted to renew his passport, or when background and record checks were done for his employment.

Almanzar stated he lived in Yonkers during that timeframe and family members were present at the time the United States Marshals Service made contact at the addresses.  Additionally, while Special Agent Nawrocki testified as to what is typically done to recertify a warrant in NCIC, he could not testify as to any specifics as to German-Almanzar.  While there is no evidence that Detective Keppel and law enforcement ignored potential leads, it appears that they did not act diligently in pursuing German-Almanzar's whereabouts.

The court finds German-Almanzar's situation similar to that presented in *United States v. Davenport*, --- F. Supp. 3d ----, No. 21-480, 2024 WL 1442299, at *7 (W.D. Pa. Apr. 3, 2024).  In *Davenport*, after county charges were nolle prossed against the defendant, the United States filed a federal indictment on November 17, 2021 and an arrest warrant was issued the same day.  2024 WL 1442299 at *1. The defendant was arrested on March 16, 2023, sixteen months after the arrest warrant was issued.  *Id.*  Between indictment and arrest, the detective tasked with locating the defendant conducted surveillance at various times of day on the defendant's last known address.  *Id.* at *4.  The detective never saw the defendant at that address, but also never knocked on the door although he conceded that he could have.  *Id.*  The detective testified about "probably" surveilling that address about six times and asking other law enforcement officers to take the defendant into custody if they saw him.  *Id.*  Additionally, law enforcement conducted social

media searches for the defendant and reviewed information from the Pennsylvania Department of Labor to try to determine the defendant's employer. *Id.* The detective received some information regarding employment but failed to follow up with a prior employer to attempt to obtain contact information for the defendant. *Id.* In January 2023, the detective referred the defendant's case to the United States Marshals and the defendant was arrested in March 2023. *Id.*

The court in *Davenport* found that "the Government was not reasonably diligent in its pursuit" of the defendant. *Id.* at *8. In making this finding, the court stated that "'*probably*' conducting surveillance 'at least a half dozen times' in 13 months fails to establish reasonable diligence." *Id.* (emphasis is original). Additionally, the court stated that law enforcement failed to diligently use all the available information it had to locate the defendant such as contacting his prior employer. *Id.* at 9. In sum, the court held that it was "unable to conclude that the Government's efforts in pursuing and arresting Defendant were reasonably diligent, particularly given that Defendant did not engage in intentionally evasive conduct . . . . [and] that the Government was negligent in its pursuit of Defendant." *Id.*

Further, the court the court does not agree with the Government that *Velazquez* supports their argument. In *Velazquez*, the court overturned the district court's determination that the government was reasonably diligent in pursuing the

defendant and found that the Government fell "far short of the mark."  749 F.3d at 175–181.  While the factual circumstances in *Velazquez* are more pronounced than here, the dilatory efforts are similar – law enforcement failed to put forth serious effort to locate defendants.  *See id.* at 181–82.

Accordingly, the court finds that the Government failed to meet the reasonable diligence standard and was negligent in its pursuit of German-Almanzar.  Thus, the reason for the delay weighs against the Government.

### C.   Assertion of His Right

The court thus turns to the third factor for consideration: the defendant's assertion of his right, "including 'the frequency and force' of such assertions." *Velazquez*, 749 F.3d at 183 (quoting *Barker*, 407 U.S. at 529).  This factor is "entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."  *Barker*, 407 U.S. at 531–32.  In *Barker*, the Court specifically emphasized that a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  *Id.* at 532.  A defendant's assertion of his speedy trial right "must be viewed in the light of [the defendant's] other conduct."  *Loud Hawk*, 474 U.S. at 314.

German-Almanzar argues that he could not assert his speedy trial right until he knew of the charges against him.  (Doc. 39, p. 7.)  Once he was arraigned and appointed counsel on November 17, 2022, German-Almanzar "forcefully" raised

the issue with his prior counsel.  (*Id.*)  This caused prior counsel to request removal

from the case so that German-Almanzar could pursue his Sixth Amendment rights

with other counsel.  (*Id.* at 7–8.)  Current counsel was appointed on March 3, 2023,

and submits that these issues were raised as early as possible on July 27, 2023.  (*Id.*

at 8.)

In its brief, the Government asserts that because German-Almanzar waited

nine months after his arraignment to assert his Sixth Amendment rights, this factor

should not weigh against the Government or in German-Almanzar's favor.  (Doc.

42, pp. 13–14.)  However, during the evidentiary hearing, the Government agreed

that German-Almanzar appropriately asserted his right and submits that this factor

is neutral.

The court finds that this factor weighs in German-Almanzar's favor.

German-Almanzar raised his Sixth Amendment right so forcefully that it caused a

breakdown in his relationship with his prior counsel within five months.  Once new

counsel was appointed, counsel filed this motion to dismiss as early as possible.

The court finds that German-Almanzar asserted his right appropriately.  Thus, this

factor weighs in his favor.

### D. Prejudice

Finally, the court considers the issue of prejudice to German-Almanzar.  The

Supreme Court has identified "three types of harm that arise from unreasonable

delay between formal accusation and trial: (1) 'oppressive pretrial incarceration;' (2) 'anxiety and concern of the accused;' and (3) 'the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence'." *Claxton*, 766 F.3d at 296 (quoting *Doggett*, 505 U.S. at 654).  While excessive delay can lead to a presumption of prejudice, "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . it is part of the mix of relevant facts, and its importance increases with the length of delay."  *Doggett*, 505 U.S. at 655–56.

Here, German-Almanzar has been released on conditions since his arraignment and no argument has been raised regarding his anxiety and concern. Thus, the court focuses its attention on whether German-Almanzar's defense is prejudiced by the delay in bringing him to trial.

"Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having . . . specific prejudice." *Velazquez*, 749 F.3d at 175 (citing *Doggett*, 505 U.S. at 658) (finding a Sixth Amendment violation where the government's negligence caused a six-year delay). The general presumption of prejudice can be overcome by the government "proving a negative—the absence of any prejudice to a defense from the passage of years." *Id.* (citing *Doggett*, 505 U.S. at 658 n.4.)  Thus, to "warrant granting relief,

negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." *Doggett*, 505 U.S. at 657. In *Doggett v. United States*, the Supreme Court found that a six-year delay attributable to the government met the durational requirement for relief without specific prejudice because the presumption of general prejudice was not "persuasively rebutted." *Id.* at 658; *see also Velazquez*, 749 F.3d at 185 (finding that a delay of seven years was sufficient to establish general prejudice and the government could not rebut that presumption).

German-Almanzar has not argued any specific prejudice; rather, he relies on general prejudice from the passage of time. However, the court is not convinced that 45 months is sufficient to meet the durational requirement for relief without specific prejudice. At the evidentiary hearing, the Government asserted that proving the allegations in the indictment involves evidence of the controlled purchases of narcotics which were observed by law enforcement, the execution of a search warrant, testimony from confidential informants, and admissions by German-Almanzar during interviews with law enforcement. The nature of the charges in this case are straightforward and the evidence required to prove the charges is not complex or voluminous. (*See* Doc. 42, p. 16.) Further, German-Almanzar has not mentioned any specific way in which his defense has been impacted or prejudiced by the passage of time. Thus, even if the durational

requirement has been met here, the Government has sufficiently rebutted the presumption that German-Almanzar suffered from general prejudice.

Although the court finds that the length of delay, reason for delay, and assertion of right factors weigh in German-Almanzar's favor, the court will deny the motion to dismiss because German-Almanzar has not established general or specific prejudice resulting from this delay.

## CONCLUSION

Based on the foregoing discussion, the court concludes that the *Barker* factors weigh against dismissal of the indictment. The court finds that German-Almanzar's Sixth Amendment right to a speedy trial has not been violated. Thus, the court will deny German-Almanzar's motion to dismiss the indictment. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: May 16, 2024